## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA**

       **Plaintiff,**

**v.**                                     **Case No.  8:06-cr-279-T-17TBM**

**JORGE ENRIQUE VALENCIA-VERGARA**

       **Defendant.**

_____/

### REPORT AND RECOMMENDATION

THIS MATTER is before the court on referral by the Honorable Elizabeth A. Kovachevich for a Report and Recommendation on Defendant's **Motion to Dismiss Indictment for Outrageous Government Misconduct or Alternatively Motion to Suppress Statements and Memorandum of Law in Support Thereof** (Doc. 70) and the Government's response in opposition (Doc. 76).[1]  An evidentiary hearing was conducted on September 25, 2006.  The Defendant testified, as did FBI Special Agent Alex F. Faria.  A summary of their testimony follows.

A.

Special Agent Alex Faria (hereinafter "Faria") testified that he is a fourteen-year veteran of the FBI.  He was recently assigned to the Tampa division in May 2006, working out

---

[1]Defendant and eight other foreign nationals were indicted on July 11, 2006.  The two-count Indictment charges that, while on board a vessel subject to the jurisdiction of the United States, the Defendants conspired to possess with intent to distribute and possessed with intent to distribute five kilograms or more of cocaine.

of the Sarasota office.  Along with other agents, Faria is assigned to the PanEx investigation.[2]

Faria's past experience was investigating drugs and violent crimes.  While he indicated no

prior experience with such so-called "boat cases," he was briefed by his supervisor on

Operation Panama Express.

Faria learned that the Defendant and others were arrested on or about July 7, 2006,

on board the F/V Cisne.  The witness was advised that the vessel contained approximately

3,800 kilograms of cocaine and the Defendant was identified as a crewman.  Faria's first

contact with the Defendant was mid-July, either July 14th or July 15, 2006.  The Defendant

and one Henry Lerma were transported by airplane to Tampa, Florida, because both had

received burns after the fishing vessel was set on fire.  Faria and other agents met the

Defendant and Lerma at an airfield and transported them to the emergency room at Tampa

General Hospital.  According to the witness, they arrived at the hospital approximately one to

one and a half hours after the landing.  The agents spoke with the Defendants[3] during this

period, but did not attempt to interrogate them.  Later in the evening, after the Defendant

received medical care and about four to six hours after his arrival in Tampa, Faria read the

Defendant his Miranda rights from a written form.  The Defendant asked multiple times for an

explanation and ultimately indicated he wished to have an attorney.  On questioning by

---

[2]Operation Panama Express, aka PanEx, is the code name for a joint federal law
enforcement initiative to interdict cocaine laden vessels in the Eastern Pacific, Gulf of Mexico
and Carribean Basin.  Crewmen on such vessels are routinely transported to the Middle
District of Florida for prosecution in the Tampa Division of the court on drug-related offenses.
Within the court, the cases are commonly referred to as "boat cases."

[3]Faria's native language is Spanish and his conversations with the Defendant were in
all in Spanish.

defense counsel, the agent acknowledged that the Defendant was a younger man from Colombia who appeared scared and in pain because of his burns.  The agent testified that prior to advising the Defendant of his <u>Miranda</u> rights, he had only engaged in "chit chat" with the Defendant and had not attempted to interview him regarding his criminal activity.  Faria denied that he ever advised the Defendant that he was not interested in him because he was only a "mule."

When asked whether he discussed the sentencing guidelines with the Defendant, Faria answered vaguely by noting the he could discuss them in general terms, but not in detail.  According to Faria, his general "pitch" is to say that those who cooperate with the investigation will be considered for a reduction of levels and although he cannot promise or tell the person a particular number of levels because that is up to the prosecutor, he makes it known that cooperation can result in a reduced sentence.  He acknowledged telling the Defendant specifically that there were ways to reduce his sentence, for instance, by not resisting arrest and by cooperating with the government.  According to the witness, he attempted to paint the "big picture" regarding sentencing by pointing out the possibilities of how the Defendant might assist himself.  Faria acknowledged that these communications with the Defendant occurred both before and after he was advised of the <u>Miranda</u> warnings and requested an attorney.  Faria told the Defendant that he would be given an attorney at his appearance before the magistrate.

Faria remained at the hospital the rest of the night.  He was relieved the following morning by other agents.  At some point, he offered his business card to the Defendant and

advised that if he wished to speak with him in the future, he should call him directly.  Faria

indicated that he had accepted such collect calls for years.

Faria stated he was present in court during Defendant's initial appearance and in fact

spoke with Mr. Castillo, the attorney appointed to represent the Defendant.  The witness

denied that Defendant had made any incriminating statements to him prior to the initial

hearing (or after).  He did indicate that the Defendant gave the "standard story that all

mariners give us," that is, that while on the high seas they were approached by another boat,

kidnaped and forced to take on the drugs.  This statement would have occurred at the hospital

before he was advised of the <u>Miranda</u> warnings.

Regarding Faria's offer to help the Defendant place a call to his family to let them

know that he was alive, this evolved into the agent helping Defendant place numerous calls by

way of a three-way phone call.  Thus, the Defendant would call Faria at the FBI office, give

him a number to call in Colombia, and Faria would facilitate the call.  During the call, the

conversation would be played on the speaker phone at the FBI office and would be monitored

by the agent and anyone else present.  According to Faria, he arranged the calls to be

"benevolent."  The calls were not documented and Faria claims that he took no notes and

really did not pay too close attention during the conversations.  Faria testified that "a number"

of other FBI agents engaged in this practice.  This was not a practice they were told to engage

in, but one that occurred with some routine in boat cases.  In all, the witness estimated that

there were four to six of these calls.  The phone calls were paid for by the FBI.  Defense

counsel was not advised of the calls.

4

In August 2006, the witness called attorney Castillo to advise him that the Defendant had called him and requested a meeting so that he could make a proffer.  At some point, the Defendant had advised Faria that he was having difficulty reaching his attorney.  On August 30, 2006, the agent and counsel met with the Defendant at the Orient Road jail in Hillsborough County, Florida.  At this point, the agent had not spoken with the prosecutor and he had neither a "proffer letter" nor a plea agreement to offer the Defendant.  After speaking with his client (and learning of the contact between Defendant and Faria), attorney Castillo advised the agent that the timing wasn't right for a proffer and the agent left.  The Defendant appeared visibly upset after speaking with counsel.

Faria denied telling the Defendant that he could receive a sentence of four years or less.  He denied talking about specifics of the sentencing guidelines.  He testified that he seemed to recall one case where a crewman in a boat case may have received a time served disposition, which was about four years.  The Defendant never told the agent he wanted to plead guilty; rather, he said only that he wanted to talk to the agent.

On questioning from the prosecutor, Faria denied that he ever interrogated the Defendant about his involvement on the boat after he invoked his Miranda rights.  According to the witness, Defendant's statement giving the standard mariner's pitch was volunteered by the Defendant.  Faria testified that while he has a general understanding of the sentencing guidelines, he is not an attorney and does not own a copy of them.  Other than advising the Defendant that his sentence would be determined according to sentencing guidelines and that cooperation with the government generally resulted in a reduced sentence, he gave the Defendant no further advice about the guidelines and he did not estimate the length of the

5

Defendant's potential sentence.  According to the witness, Defendant made no statements that would be helpful to the prosecution of his case.  The witness agreed that he treated the Defendant with respect.  He indicated that one reason for this was that at some point the Defendant might be cooperating and he wanted the Defendant to trust him.

Faria set up the meeting at the Orient Road jail after the Defendant called him.  He knew the attorney had to be present.  Faria was surprised that the meeting did not go forward.  After that meeting, Faria received a call from the prosecutor, Mr. Muench, who advised that attorney Castillo had complained and the agent could not have further contact with the Defendant without his attorney's permission.

In response to questions from the court, the witness said that this was his first boat case.  Upon transport to the hospital, the Defendant was admitted to the emergency room.  He received I.V. fluids, a shot of morphine, and then his burned flesh was removed and he was bandaged and released to the agents.[4]  Once a room came open, the Defendants were taken to it and at about midnight, the agents attempted to interview with them.  The witness stated again that he offered to help the Defendant call home because he felt sorry for his situation and to be benevolent.  Faria admitted, however, that he was also trying to cultivate Defendant as a potential cooperating defendant.  The Defendant was kept in the hospital for several days before his initial appearance.  Faria did not attempt to get an attorney for the Defendant after he requested one, but he denies interrogating him after that point either.  The agent was aware that attorney Castillo was appointed at the initial hearing.  According to Faria, all the

---

[4]Co-defendant Lerma received similar medical treatment at the emergency room.

subsequent contacts were initiated by the Defendant.  The agent did not believe he was doing

anything wrong by continuing to speak with the Defendant thereafter because he did not

attempt to interrogate the Defendant after the Defendant invoked his rights.  Faria testified

that several agents handling boat cases engage in this type interaction with defendants.  Faria

arranged third-party phone calls on behalf of Lerma and all but two of the defendants in this

matter.  To one degree or another, all seven of these individuals have confided in the agent as

to their involvement.  It is not this witness's practice to document these contacts and he does

not alert defense counsel when contacted in the manner here described.  The conversations are

recorded by the jail.  In a follow-up question, the witness indicated that his supervisor has

advised the agents to cease these practices.

   The Defendant testified that he is twenty-five years old and was born in

Buenaventura, Colombia.  He was arrested on July 7, 2006, by the United States Coast Guard.

He was burned on his arm and leg after a fire was started on the boat.  He and a co-defendant,

Mr. Lerma, were flown to Tampa for medical care.  By his recollection, he was met by

someone from Immigration at the airfield, as well as unidentified agents.  When he was placed

in a vehicle for transport, an unidentified agent began asking if they would cooperate and give

them the names of the "narco-traffickers."  By the Defendant's account, he did not meet Faria

until he arrived at the hospital.  Faria began speaking with him even before he received any

medical treatment.  Faria asked him where he worked, whether he was studying, and if he had

a woman/wife.  Faria also told him that when he was taken to a room, they were going to talk

to him and read him some rights.  The agent also offered to make a call to the Defendant's

house.  Faria told him that he would be tried differently here than in Colombia, as the laws

were different.  Faria also told him that there was a table with numbers that applied and if he accepted responsibility it would be reduced, if he signed an agreement he would get minimum participation, and he would get two to four points taken off since he did not resist arrest.  The agent further indicated that he would begin at a level 30 and from there they would begin to discount.

Subsequently, on an occasion when Faria visited him in jail alone, Faria advised that he would receive five years.  This conversation with the Defendant occurred sometime after an August 11, 2006, court hearing.  By the Defendant's account, the agent visited with him and advised that his attorney had not been in court for a hearing.  The agent also advised him that he could ask his attorney for stamps and envelopes.

The Defendant indicated that he had placed three-way phone calls to his family in Columbia both through his attorney and Faria.  Faria was easier to contact.  The Defendant acknowledged that when his attorney was appointed, the attorney told him not to speak with anyone about the case.  The Defendant acknowledged that he did not advise his attorney of his contacts with Faria until the meeting on August 30, 2006.  At that meeting, the Defendant acknowledged that he was upset with his attorney because Mr. Castillo was advising him that if he pleaded guilty he would receive from eleven to fourteen years in jail and that he would begin at a level 38 and could be reduced only to a level 33.  This conflicted with Faria's statement that he would begin at a level 30, and with reductions, he could end up at a level 20 or 21.  Defendant acknowledged that he and counsel had discussed a defense for trial, but at this point he had changed his mind and wanted to plead guilty.  After the meeting on August 30, 2006, Defendant sent a letter to the district judge asking that counsel be removed because

8

he did not believe his attorney was helping him, as evidenced by the discussions regarding the sentencing guidelines.[5]  In the Defendant's view, the eleven-year sentence his attorney was mentioning was too great a sentence and would be unjust.  According to the witness, although he resolved his differences with his attorney, part of the problem with him making a decision has been his confusion, prompted in part by him receiving different information from his attorney and the agent.

On cross-examination by the Government, the Defendant acknowledged that he and Lerma were flown specially to Tampa to receive treatment for their burns.  It was at the hospital that he first met Faria.  According to the witness, from that point forward, Faria was always nice to him and treated him like a friend.  The Defendant indicated that the agents indicated they were going to ask some questions when he was taken to a room and read him some rights and that he had to sign some paper before they could do that.  According to the witness he refused to sign the paper.  He testified that after that, there were no questions by Faria about his criminal activity.  The Defendant further stated that on July 19, 2006, he appeared in court and Mr. Castillo was appointed as counsel.  Mr. Castillo and the judge advised him that he did not need to talk to anybody about his case.  During the three-way phone calls set up by the agent, Faria did not question him about the case, although the Defendant did discuss with his family what had happened to him.  According to the Defendant, he spoke numerous times with Faria to set up these three-way calls and that is was

---

[5]At the outset of this hearing, the court addressed the Defendant's complaints as set forth in this letter.  The Defendant stated he wished to continue with Mr. Castillo as his counsel.

much easier to do this through Faria than through his own attorney.  After August 30, 2006, the Defendant attempted to set up another call through Faria, but Faria advised that he could not speak with the Defendant on orders from his attorney.  The witness advised that he had no complaints against Faria, although his complaints against his own lawyer were based on what Faria had been telling him versus what the attorney was telling him.  He was prompted to write the letter to the judge requesting new counsel because his counsel had not gone to court for him and had told him that the level of his sentencing guidelines was higher than what the agent had advised.  As a consequence, the Defendant trusted more in what the agent was telling him that what his own attorney was telling him.  When asked by the prosecutor whether he still wished to plead guilty, the Defendant indicated that he did not know because he was still confused.

        In questioning from the court, the Defendant indicated that before he began receiving "the cure" (as in treatment) at the hospital, Faria asked some personal questions as noted above and then spoke to him about how he was going to be sentenced, indicating that if he signed a guilty plea and one of the Defendants went to trial he could testify against them and his time would be lowered and the other defendant's time would go up.  Faria also offered to make calls to his family and told the Defendant when he was brought up to a room they were going to questions him and read him his rights.  According to the witness, after leaving the hospital, he next spoke Faria via the telephone.  He did not see the agent again until after August 11, 2006.  By his testimony, he and Faria were cut off during a phone call and that afternoon the agent came to visit him at the jail.  The agent advised him that his attorney had not gone to court, that his attorney had a right to provide envelopes to him, and that if the

judge found him guilty, she would give him five years.  According to the witness, the agent advised him not to say anything to his attorney.

B.

Defendant argues that the conduct of Faria and other unidentified agents of the FBI was so outrageous that it violated his Fifth Amendment due process rights such that dismissal of the Indictment is warranted.  More particularly, he asserts that the Government's conduct crossed the line between effective investigation and constitutional violation, "the endearing of a scared and ignorant defendant to an agent's so called benevolence of making three way telephone calls or giving legal advice is so outrageous that it does shock the universal sense of justice . . ." (Doc. 70 at 16).[6]  He further urges that the "intentional and forceful intrusion into the attorney-client relationship which creates a conflict between the attorney and client by government action results in injury to the rights of all criminal defendants and citizens alike." Id. at 17.[7]  Alternatively, claiming Miranda  violations, the Defendant argues that the Government should not be able to utilize any information obtained as a result of the agents' conduct during its case-in-chief.  Id.

In response, the Government contends that dismissal is an extreme sanction and is not warranted under the circumstances.  In support thereof, it cites to United States v. Glover, 596 F.2d 857 (9th Cir. 1979); United States v. Laury, 49 F.3d 145 (5th Cir. 1995); and United

---

[6]To support this assertion, Defendant relies on United States v. Russell, 411 U.S. 423 (1973) and its progeny.

[7]Citing United States v. Simpson, 927 F.2d 1088, 1090 (9th Cir.1991), Defendant also asserts that even in the absence of a due process violation, the court may dismiss the case under its supervisory powers.

States v. Owen, 580 F.2d 365 (9th Cir. 1978).  Further, it asserts that it does not intend to

offer any post-arrest statements made by the Defendant and accordingly, there are no

statements to suppress.  (Doc. 76).

C.

In this context, to constitute a Fifth Amendment violation the government

misconduct must be so "outrageous that due process principles would absolutely bar the

government from invoking judicial process to obtain a conviction."  Russell, 411 U.S. at 431-

32 (citing Rochin v. California, 342 U.S. 165 (1952)).  Stated otherwise, such governmental

misconduct must be fundamentally unfair and "'shocking to the universal sense of justice,'

mandated by the Due Process Clause of the Fifth Amendment."  Id. at 432 (quoting Kinsella

v. United States ex rel. Singleton, 361 U.S. 234, 246 (1960)).  "Whether outrageous

government conduct exists 'turns upon the totality of the circumstances with no single factor

controlling' and the defense 'can only be invoked in the rarest and most outrageous

circumstances.'"  United States v. Haimowitz, 725 F.2d 1561, 1577 (11th Cir. 1984) (quoting

United States v. Tobias, 662 F.2d 381, 387 (5th Cir. Unit B. 1981)).  "It is well-settled that

dismissal of an indictment due to government misconduct is a rare remedy, justified only

where a constitutional violation has caused prejudice to the defense or a 'substantial threat

thereof.'"  United States v. Valencia-Trujillo, No. 8:02-cr-329-T-17EAJ, 2006 WL 1793547,

at * 9 (M.D. Fla. June 26, 2006) (quoting United States v. Morrison, 449 U.S. 361, 365

(1981)).

The Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall

. . . have the assistance of counsel for his defense."  U.S. Const. amend. VI.  In prosecutions

12

such as that before this court, the assistance of counsel is viewed as a "requisite to the very existence of a fair trial." Argersinger v. Hamlin, 407 U.S. 25, 31 (1972).  However, the remedy for a violation of a defendant's Sixth Amendment rights is generally accepted to be suppression of the evidence and any fruits thereof rather than dismissal.  See United States v. Ofshe, 817 F.2d 1508, 1515 (11th Cir. 1987).  Thus, in Morrison, the Supreme Court considered whether dismissal of the indictment was proper where DEA agents met with a defendant who they knew had retained counsel, encouraging her to cooperate and disparaging her attorney.  In reviewing prior cases involving Sixth Amendment deprivations, the Court noted that such cases "are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."  Morrison, 449 U.S. at 364.  Assuming without deciding that a Sixth Amendment violation had occurred, the Court held that the dismissal of the indictment under these circumstances was inappropriate, absent a showing of any adverse consequent to the representation received or to the fairness of the proceedings leading to the conviction.  Id. at 366-67.

Regarding a court's supervisory authority in fashioning remedies for constitutional violations, the Supreme Court has stated:

> '[G]uided by considerations of justice,' and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.  The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct.

13

United States v. Hasting, 461 U.S. 499, 506 (1983) (citations omitted).  However, supervisory powers are not exercised in a vacuum and must be approached with caution and with a view toward balancing the interests involved.  Id. at 507.

D.

The conduct of agent Faria and other unidentified agents in this matter,[8] even if well-intended as claimed, was reprehensible and unbecoming of any federal law enforcement officer practicing before this court.  At all times during which these agents had contact with the Defendant, he was under indictment and entitled to the assistance of counsel.  See Massiah v. United States, 377 U.S. 201 (1964).  From the outset, Faria's conduct was offensive to any sense of fair dealing in these matters.  His insistence in attempting to befriend the Defendant and to speak with him about sentencing matters and how his sentence might be reduced by cooperation, before advisement of the Miranda warnings, was contrary to both the spirit the letter of the Miranda decision.[9]  Faria's insistence on continuing to speak with the Defendant

---

[8]While my conclusions relate to this case alone, there is no reason to believe that federal agents have not engaged in similar conduct, without the knowledge of defense counsel, in numerous other boat cases brought to this court.

[9]The Defendant had been in custody since July 7, 2006.  Any interrogation thereafter should have been preceded by the Miranda warnings.  Miranda v. Arizona, 384 U.S. 436 (1966).  As is the unfortunate norm in these cases, the Defendant and his co-defendants were without the benefit of counsel for nearly two weeks during their transport into this jurisdiction.  There is no indication that the Defendant was advised of his Miranda rights during this interval.  While not all that Faria said to him would constitute interrogation, I find that the statements about cooperation and the sentencing process were.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.").  These statements by Faria, which assumed the Defendant's guilt, were calculated to get the Defendant to incriminate himself and others and constituted interrogation.

14

even during his emergency care is rather astonishing.  By the agent's own account, the Defendant was given morphine so that his burnt flesh could be stripped off his arm and leg.[10] Faria's open offer to assist the Defendant in contacting his family, even after the Defendant had requested an attorney, was a calculated invitation to assure that the Defendant would continue to contact him.  The continuous, surreptitious contacts with the Defendant even after he was appointed counsel are offensive to both Fifth and Sixth Amendment considerations and demonstrably undermined the attorney-client relationship between the Defendant and Mr. Castillo by instilling in the Defendant a complete distrust in his attorney's advice and counsel. Faria's solo jail visit with the Defendant in August is particularly offensive to Sixth Amendment considerations.  Faria's response to all this, namely, that he did not believe he was doing anything wrong because he did not interrogate the Defendant, is fatuous.  This fourteen-year agent knew full well that the Defendant was represented by counsel and that he had no right to initiate any unsolicited contact with the Defendant without counsel being present.  See Arizona v. Roberson, 486 U.S. 675 (1988); Edwards v. Arizona, 451 U.S. 477 (1981).

While I am forced to conclude under controlling case law that Faria's conduct does not involve the type of outrageous governmental misconduct theorized in Russell and does not call for dismissal under the Sixth Amendment, his conduct, as well as that of the other unidentified agents, demonstrates a distinct disregard for the legal and constitutional rights of the Defendant and a number of his co-defendants and a disrespect for the high ethical

---

[10]By Faria's account, the medical procedure was such that a fellow agent was unable to watch the procedure on Mr. Lerma and Faria had to relieve him of the watch.

standards expected of those who routinely practice before this court.  In my view, the
"benevolent" efforts of Faria and others to befriend and assist the Defendant and his co-
defendants in the manner here revealed are better understood as deliberate strategic efforts of
experienced agents to exploit the circumstances in which defendants in these boat cases
routinely find themselves.  The Defendant, like the scores of other such crewmen seized and
brought to this district for prosecution in the PanEx investigation, is clearly an unsophisticated
individual who is without any financial resources of his own, is unable to speak English and is
without any understanding of the American judicial system.  Faria and his cohorts understood
this and played on these circumstances in an underhanded manner to influence cooperation
and a guilty plea.  Nevertheless, for the reasons that follow, I am constrained to find that these
circumstances do not call for dismissal of the Indictment as Defendant fails to identify
sufficient prejudice to his rights to due process and a fair trial.

As defense counsel himself concedes, the remedy of dismissal for government
misconduct is intended for only the most outrageous of cases amounting to a due process
violation and, to date, it appears neither the United States Supreme Court nor the Eleventh
Circuit have reversed a conviction on that basis.  In Morrison, the Court observed that, "absent
demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly
inappropriate, even though the violation may have been deliberate." Id., 449 U.S. at 365
(citing United States v. Blue, 384 U.S. 251 (1966)).  Here, while I have determined that Faria
acted deliberately in all his dealings with the Defendant, there is no showing of real harm to
the Defendant.  Thus, the Government did not gain any additional evidence from these

activities, at least none that has been revealed or that the Government says it will attempt to use at trial.  The conduct revealed here does not amount to a due process violation.

As for the Sixth Amendment violations identified here, a review of the applicable case law reveals that the existence of prejudicial evidence is pertinent to the claim of interference with the attorney-client relationship and that the appropriate remedy for the violation is suppression of any illegal fruit, not dismissal of the indictment.  Thus, the existence of the claim and the need for any remedy hinges on a showing of real prejudice.  See Morrison, 449 U.S. at 365 ("Similarly, when before trial but after the institution of adversary proceedings, the prosecution has improperly obtained incriminating information from the defendant in the absence of counsel, the remedy characteristically imposed is not to dismiss the indictment but to suppress the evidence . . . ."); United States v. Irwin, 612 F.2d 1182, 1186 (9th Cir. 1980) (". . . the existence or nonexistence of prejudicial evidence derived from an alleged interference with the attorney-client relationship is relevant to determining if the defendant has been denied the right of counsel . . . dismissal for governmental misconduct 'is an extreme sanction which should be infrequently utilized' and requires a showing of prejudice"); see also United States v. Melvin, 650 F.2d 641, 644 (5th Cir. Unit B 1981).  In United States v. Walker, 839 F.2d 1483, 1486-87 (11th Cir. 1988), in the face of an arguably more egregious interference with the right to counsel,[11] the Eleventh Circuit, citing Morrison,

---

[11]Throughout the pretrial period, unbeknownst to his attorney, Walker was cooperating with the government and providing information on others and himself.  He was convicted after trial, although no evidence derived from his cooperation was used against him.  Post-trial, with new counsel, he complained that his relationship with former counsel had been irrevocably damaged and new counsel sought dismissal of the indictment or a new trial.  After a hearing, the district court granted a new trial.  Walker thereafter entered a conditional plea,

declined to reverse the judgment and order dismissal of the indictment because the Defendant had failed to demonstrate the specific ways that his trial had been compromised by the interference with his relationship with counsel.

Here, assuming a Sixth Amendment violation, the Defendant is unable to demonstrate the actual prejudice or threat of actual prejudice to his rights to a fair trial sufficient to warrant a dismissal of his indictment.  Morrison is again instructive.  Similar to the instant matter, agents met with Ms. Morrison post-indictment without the knowledge or permission of counsel.  In the course of such contacts, the agents disparaged Morrison's attorney.  Additionally, the agents suggested that she would obtain various benefits if she cooperated and would receive a harsh sentence if she did not.  Morrison declined to cooperate with the agents and gave no incriminating statements.  Finding no prejudice of any kind, the Court reversed the lower court decision dismissing the indictment, noting that while it did not condone the egregious conduct of the government agents, dismissal of the indictment was inappropriate where the violation has had no adverse impact upon the criminal proceedings. See Morrison, 449 U.S. at 367.  The Defendant makes no showing why the same result should not pertain here.

The Morrison decision further instructs that the remedy for a Sixth Amendment violation should be tailored to the injury suffered and, as noted above, that remedy is generally to suppress the illegal fruits of such violation to assure a fair trial (or to grant a new trial.)  See Morrison, at 365.  This remedy is premised on the view that "the constitutional infringement

_____

arguing that the court should have dismissed the indictment.

identified has had or threatens some adverse effect upon the effectiveness of counsel's

representation or has produced some other prejudice to the defense.  Absent such impact on

the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding,

. . ."  Id.  Here, as in Morrison, the Defendant makes no showing that Faria's interference with

the attorney-client relationship, as offensive as it is, resulted in any incriminating statements or

other evidence which could be used against him in further proceedings.  And, in any event, the

Government pledges not to use any such evidence even if it exists.  Although counsel's efforts

were interfered with and a wall of distrust was created for a time by Faria's interference, there

is no showing that counsel has been or will be prevented from providing the Defendant with

competent and effective representation in these proceedings.[12]

        Finally, insofar as the Defendant argues that the remedy of dismissal of the

Indictment is appropriate in the court's exercise of its supervisory powers, this argument must

likewise fail.  As set forth above, while the Supreme Court has identified three circumstances

when the exercise of supervisory authority is appropriate, it has cautioned that these powers

are not exercised in a vacuum and must be approached with a view toward balancing the

interests involved.  Here, an Order directing the dismissal of the Indictment is unjustifed when

all the circumstances are weighed in the balance.  The lack of actual prejudice to the

---

[12]Alternatively, Defendant argues that the Government should not be able to utilize in its case-in-chief any statements obtained as a result of the alleged Miranda violation.  Again, the Government responds that, since his arrest, the Defendant has not made any inculpatory statements to law enforcement or to family during the "three-way" calls.  Further, the Government asserts that it does not intend to offer any post-arrest statements made by the Defendant if this case goes to trial.  Thus, while I find a violation of Miranda, there appears no need for further action by the court unless the Government should attempt to introduce post-arrest statements at trial.

Defendant, which undermines his due-process argument and his Sixth Amendment claim, militates against dismissal.  While the conduct of Faria and the other unidentified agents in disregard of the Defendant's rights under the Fifth and Sixth Amendments merits the court's condemnation and censure, such may be accomplished through other means short of dismissal.

Accordingly, for the reasons set forth above, it is **RECOMMENDED** that Defendant's **Motion to Dismiss Indictment for Outrageous Government Misconduct or Alternatively Motion to Suppress Statements** (Doc. 70) be **DENIED**.[13]

Respectfully submitted on this
10th day of October 2006.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its service may constitute a waiver of the issues raised herein and shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02.

Copies furnished to:
The Honorable Elizabeth A. Kovachevich, United States District Judge
AUSA James A. Muench, Attorney for the Government
Daniel L. Castillo, Attorney for Defendant

---

[13]As stated above, the conclusion regarding the alternative request for suppression of any illegally obtained statements is premised on the fact that there are no such statements and the Government does not intend to introduce any at trial.  My conclusions, however, dictate that should the Government attempt to introduce any statements by the Defendant to Faria or another agent made after his arrival in Tampa, the statements should be excluded from the Government's case-in-chief.